# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

KATHRYN E. ENGLE,                    )        CASE NO. 5:14-cv-1161
                                     )
                                     )
              PLAINTIFF,             )        JUDGE SARA LIOI
                                     )
vs.                                  )
                                     )        MEMORANDUM OPINION
CHARLES H. NETTLE,  et al.,          )
                                     )
                                     )
              DEFENDANTS.            )

Before the Court, in this civil rights action, are the parties' respective summary judgment motions. Defendants, Officer Daniel Randall ("Randall"), Officer Robert Schmidt ("Schmidt"), Officer David Holzapfel ("Holzapfel"), Officer Richard Garinger ("Garinger"), Officer James McGowan ("McGowan"), Officer McIlvain (aka Officer 6384) ("McIlvain"), Officer Mark Ralston ("Ralston"), Sergeant Michael Heinl ("Heinl"), and Officer 2993 (aka Officer Luggelle) ("Luggelle") (collective "officers"), and Charles Nettle ("Nettle"), seek summary judgment in their favor on all claims on the merits, as well as qualified and/or statutory immunity for each claim. (Doc. No. 128 ["Def. MSJ"].) Plaintiff Kathryn Engle ("plaintiff" or "Engle") opposes the motion (Doc. No. 148 ["Def. MSJ Opp'n"]), and defendants have filed a reply. (Doc. No. 155 ["Def. MSJ Reply"].) Plaintiff also seeks judgment in her favor on all claims. (Doc. No. 134 ["Pl. MSJ"].) Defendants have filed a brief in opposition (Doc. No. 149 ["Pl. MSJ Opp'n"]), and

plaintiff has filed a reply. (Doc. No. 156 ["Pl. MSJ Reply"].)[1] For the reasons that follow, plaintiff's summary judgment motion is DENIED, and defendants' dispositive motion is GRANTED IN PART.

## I. BACKGROUND

The present case involves a series of interactions between plaintiff and police officers and a health inspector employed by the City of Cuyahoga Falls occurring between April 15, 2013 and June 4, 2013. Each of the incidents revolved around plaintiff's son, Kory Engle ("Kory"), and her son's girlfriend, Tanya Hess ("Tanya"), and their occupation of plaintiff's home. It is undisputed that, at all times relevant to the present action, plaintiff maintained a private residence at 1936 5th Street in Cuyahoga Falls, Ohio. The parties further agree that neither Kory nor Tanya held a property interest in this residence, nor did either individual's name appear on a lease to this premises. Beyond these undisputed facts, the parties' accounts of the various encounters differ substantially. Because the Court entertains defendants' summary judgment motion first, it takes all of the facts in the light most favorable to plaintiff as the non-moving party. When the Court considers plaintiff's dispositive motion, it will view the facts in favor of defendants.

According to plaintiff, in March of 2013, she spent time in Omaha, Nebraska caring for

---

[1] This document, originally filed June 14, 2016, was styled "Plaintiff's Answer to Defense Support Brief & Plaintiff Brief for Preponderance of Evidence." Shortly after its filing, defendants moved to strike the document, claiming that it represented either an untimely reply brief in support of summary judgment for plaintiff, or an impermissible sur-reply in opposition to defendants' dispositive motion. (Doc. No. 160 ["Mot. Strike"].) Plaintiff opposed the motion to strike (Doc. No. 161 ["Mot. Strike Opp'n"]) and filed a motion for leave to refile her reply brief. (Doc. No. 164.) In her opposition to the motion to strike, plaintiff explained that she was delayed in the filing of her reply brief because of problems associated with her email system. The Court construes Doc. No. 156 as plaintiff's reply brief in support of her motion for summary judgment and accepts plaintiff's explanation as to why it was filed after the deadline set forth in the Court's Case Management Plan and Trial Order. Accordingly, defendants' motion to strike is DENIED and plaintiff's motion for leave is DENIED AS MOOT. The briefing on summary judgment is now complete and these motions are ripe for resolution.

her mother. (Doc. No. 130 (Deposition of Kathryn Engle ["K. Engle Dep."]) at 840.[2]) She decided to return to Ohio in April, however, because she had to file her taxes by April 15, 2013. (*Id*.) On her way back to Ohio, plaintiff became ill and was transported to a hospital for emergency surgery. (*Id*. 839-40.) She was released from the hospital and returned to her home in Cuyahoga Falls on April 14, 2013 to find that the handle on the front door had been damaged. (*Id*. at 825.) Once inside, she discovered a "huge mess" in the kitchen. An inspection of the rest of the dwelling revealed bags and boxes strewn everywhere and holes in the walls. When she discovered a baby's bed in her bedroom she deduced that her "estranged" son Kory had been living in her home in her absence with his "on and off girlfriend" Tanya and their child. (*Id*. at 825-26.) Because she was "exhausted" from her surgery, plaintiff immediately took some pain medication and went to bed. (*Id*. at 826)

She awoke in the middle of the night and decided to make a sign out of some poster board upon which she wrote "Kory & Tanya—Give me [a] couple Days. I am recuperating [sic] From surgery[.] You need to call & set up [a] time to come get your stuff out. I am selling [the] house. Do not trespass. Call me." (*Id*.; Doc. No. 128-2[3] at 666, all capitalization in original.) Early on the morning of April 15, 2013, she backed her van halfway down her driveway and affixed the sign to the van. (K. Engle Dep. at 826.) She returned to her bedroom and went back to sleep. (*Id*. at 827.)

---

[2] All page number references are to the page identification number generated by the Court's electronic docketing system.

[3] In her deposition, plaintiff explained that she could not reduce the actual poster to a size that could be copied. Instead, she recreated the message from the poster board onto a piece of paper and attached it as an exhibit. (K. Engle Dep. at 834.)

*First Police Visit on April 15, 2013*

Plaintiff awoke a second time briefly that morning and realized that many of her possessions, including clothing and family heirlooms, were missing. (*Id.*) Plaintiff took more pain medication and went back to sleep. (*Id.* at 828.) At 2:44 PM, plaintiff heard some loud voices and knocking at her front door. She looked out the bathroom window and saw Kory, Tanya, and four police officers walking up her driveway. There is no dispute at least one of the officers was defendant McGowan. (Doc. No. 128-10 (Declaration of Chief Jack Davis ["Davis Decl."]) ¶ 5.) Plaintiff called down to the group and inquired what was going on, and was advised by one of the officers that Kory and Tanya wanted to retrieve their belongings from her home. She directed the officers to the sign affixed to the van, advised the group that she needed to sleep, and suggested that Kory make an appointment. (K. Engle Dep. at 828-29.)

According to plaintiff, one or more officers informed her that Kory and Tanya needed to get inside the house because they lived there. (*Id.*) Plaintiff disputed this point, advising the officers that "no, they don't live here." (*Id.* at 829.) She then went downstairs and found her son preparing to enter the house through the window. Plaintiff attempted to lock window, at which time one of the officers yelled at Kory "you just break in that window right there. You go in the house. You have your ID. You just go in there and you let us in the back door." (*Id.* at 830.) Plaintiff responded "I go no. I go, he's not living here. I said, where are the keys, where is the contract, and we continually went on that." (*Id.*) Undaunted, Kory went through the unlocked window into the house, at which time he let two or three of the officers and Tanya into the home through the back door. (*Id.* at 838-39.) Again, plaintiff objected, reiterating that "[Kory and Tanya] don't live here and you have no right and they just continued to come in." (*Id.* at 830,

4

838.) Once inside, Kory and Tanya began removing items from the home. While the officers instructed the couple to only retrieve clothing, plaintiff maintains that Tanya grabbed a big box of construction toys to which he had no right. (*Id*. at 839.)

### Second Police Visit on April 15, 2013

Officer Randall returned to plaintiff's residence a second time on April 15, 2013. This time he was accompanied by Officer McIlvain. (Davis Decl. ¶ 5.) It appears from the record that the purpose of this visit was to afford Kory the opportunity to collect his cat and the cat's litter box from the residence. Kory did not gain entrance to plaintiff's home during this visit, as plaintiff managed to pass Kory the cat and its litter box through an open window. Plaintiff concedes that no officers entered her home at any time during this visit. (*Id*. at 845-46.)

### Third Police Visit on April 15, 2013

The third and final visit on April 15, 2013 appears to have been a brief stop wherein Officers Schmidt and Holzapfel arrived and left the home without interacting with plaintiff. (Davis Decl. ¶ 5; Engle Dep. at 861-62.) As was the case with the second visit, plaintiff does not suggest that anyone entered her home during this visit.

### Visit by Police, EMS, and Health Inspector on April 17, 2013

On April 17, 2013, Tanya came to the Cuyahoga Falls Police Station requesting assistance to obtain additional items from the 5th Street property. (Doc. No. 128-8 (Declaration of Richard Garinger ["Garinger Decl."]) ¶ 3.) Tanya advised Officer Garinger that she had been living at the 5th Street residence with her boyfriend and that her boyfriend's mother had returned home and would not let them in the house. (*Id*.) Garinger learned that Officer McGowan was one of the officers who had visited the residence on April 15, 2013 and contacted him about the encounter. (*Id*. ¶ 4; *see* Davis Decl. ¶ 5.) Officer McGowan confirmed that Tanya's property was

5

discovered inside the house. (Garinger Decl. ¶ 5.) Ultimately, Garinger concluded that Tanya was a resident of the property, as it was listed as her residence on her driver's license and she received mail at the residence. (*Id.*)

There is no dispute that Officers McGowan and Garinger accompanied Tanya to the residence on April 17, 2015. (Davis Decl. ¶ 6; *see* Garinger Decl. ¶ 7; *see generally* K. Engle Dep. at 864-78.) It is also beyond dispute that, upon their arrival, plaintiff refused to allow Tanya to enter to retrieve her property. (Garinger Decl. ¶ 7.) According to plaintiff, she heard knocking and went to the window above the back door, at which time Officer McGowan advised her that she had 30 seconds to get downstairs and open the back door otherwise the officers would break in. (K. Engle Dep. at 866.) When plaintiff turned around at the front of the stairs, she was surprised to find that Officer Garinger and Tanya were already inside the house.[4] (*Id.* at 867.) Officer Garinger averred that, upon observing the poor and unsanitary conditions in the home, he had concerns regarding plaintiff's ability to care for herself and requested that someone from the Housing Department and EMS respond to the residence. (Garinger Decl. ¶¶ 8, 10.)

Plaintiff states that the only article of clothing she had on at the time she first discovered Tanya and Officer Garinger in her home was a black t-shirt that did not fully cover her "privates." (K. Engle Dep. at 867.) She recalled attempting to pull the shirt down further to more fully cover her body, during which she claims Tanya was standing behind Officer Garinger laughing at her. (*Id.*) Officer Garinger informed plaintiff that they had come to get Tanya's effects. Plaintiff asked if she could be permitted to put on pants or go to the bathroom. Officer Garinger denied both requests. (*Id.*) Tanya began filling garbage bags with items from the house,

---

[4] Officer Garinger avers that, "[w]ith the request and permission of Ms. Hess, I assisted her with opening the rear door which was unlocked but blocked by numerous items." (Garinger Decl. ¶ 7.)

which included plaintiff's jewelry and watch. (*Id*. at 867, 868, 870.) Plaintiff then asked for her cell phone so that she could call her attorney. She also purportedly inquired of Officer Garinger as to whether they had any warrants and why they were in her house. (*Id*. at 868-70.)

At some point during this encounter, defendant Nettle, a housing inspector for the City of Cuyahoga Falls, arrived at the home. (K. Engle Dep. at 907; Garinger Decl. ¶ 11; Doc. No. 128-9 (Declaration of Charles Nettle ["Nettle Decl."]) ¶ 4.) He walked through the house and noted various problems with the home, including excessive garbage and blocked egresses. (K. Engle Dep. at 908; Nettle Decl. ¶ 4; Doc. No. 128-3 (photographs of the home).) As a result of what he viewed as code violations and safety hazards, he issued an emergency order declaring the property to be unfit for human occupancy. (Nettle Decl. ¶ 6.) Nettle subsequently issued plaintiff a letter outlining the violations, advising plaintiff that she was not permitted in the residence except to remedy the violations, and providing her 30 days in which to fix the violations. (*Id*. ¶ 7.)

Paramedics also eventually arrived and gained entry to the house. Plaintiff testified that Garinger advised her that he was going to arrest her, citing the mess in the house and the fact that there was not any food in the refrigerator. (K. Engle Dep. at 874-76.) When the paramedics arrived, Garinger instructed plaintiff to show them her surgery scar and they then performed what plaintiff describes as a "strip search." (*Id*. at 875, 906.) Plaintiff also advised the paramedics of the medications she was taking. (*Id*. at 878.) One of the paramedics instructed plaintiff to go to the hospital to receive an adult evaluation to make sure that she was okay. (*Id*. at 878, 880.)

After the paramedics had examined plaintiff, she again asked the officers why they had come to her home, reiterating that she had just had surgery and did not feel well. She then

7

instructed everybody to "get out of my house."[5] (*Id*. at 879.) Plaintiff's friend, Heather, drove plaintiff to the local hospital where she was examined by medical personnel at St. Thomas Hospital. (*Id*. at 881-84.) According to plaintiff, once at the hospital, she was advised that she had been "pink slipped," which plaintiff believed meant that she could be held at the hospital for a period of evaluation lasting 72 hours. (*Id*. at 884, 887.)

The last encounter with the Cuyahoga Falls Police Department that forms the basis for the present litigation occurred on June 4, 2016. Garinger avers that he responded to a call placed by plaintiff to the police department in which she requested police assistance in removing an "unwanted person" from the residence. (Garinger Decl. ¶ 13; K. Engle Dep. 921, 923.) According to defendants, Officer Garinger was accompanied by Officer Ralston. (Davis Decl. ¶ 9.) Plaintiff insists that Sargent Heinl accompanied Garinger. (K. Engle Dep. at 920.) Upon arrival, Garinger claims that he found Tanya outside the residence picking up items that plaintiff had left for her. (*Id*. ¶ 13.) What followed next is highly disputed. Plaintiff testified that, while Tanya was in her driveway collecting the items plaintiff had placed for her on the patio, Tanya was screaming at her. (K. Engle Dep. at 922.) Once on plaintiff's back porch, Officer Garinger informed plaintiff that he was going to "breakdown the door again." (*Id*. at 923-24.) Plaintiff said "please, dear God, I can't afford another [door]." (*Id*. at 924.) Plaintiff instructed Garinger to get off the back porch and she would open the door and come out. (*Id*.) Instead of complying with her request, plaintiff maintains that Officer Garinger pushed the door open and entered the kitchen, and, in the process, pushed plaintiff into the refrigerator in the kitchen. (*Id*. at 924-25,

---

[5] While this point is not entirely clear from the record, plaintiff suggests that, at some point, she contacted a friend, Heather, who agreed to come to the home. (K. Engle Dep. at 872-73.) According to plaintiff, Heather also inquired as to why the officers were in plaintiff's home and "sent everyone out." (*Id*. at 878.)

926.)

Plaintiff alleges that, at some point during the encounter, Officer Garinger and Sargent Heinl accused her of living in the home while she attempted to remedy the health code violations. (*Id*. at 920.) Garinger also intimated that she had made no progress in remedying the code violations, a fact which plaintiff disputed. (*Id*. at 926.) When plaintiff suggested that Garinger contact Nettle to confirm that plaintiff had made progress on the house, Garinger advised plaintiff that he had already contacted Nettle. According to plaintiff, Nettle came out to the house at some point, looked around, and declared that the house looked good. (*Id*. at 929-30.) After plaintiff contacted her attorney, and Officer Garinger spoke with the attorney by phone, plaintiff states that the officers and Nettle left her home and the encounter ended. (*Id*. at 934.)

Plaintiff, acting *pro se*, filed the present action on April 15, 2014 in state court against defendants, the City of Cuyahoga Falls, the Cuyahoga Falls Police Department, Saint Thomas Hospital, and various healthcare employees. (Doc. No. 1-1 (State Court Complaint).) The action was removed to federal court on May 30, 2014. (Doc. No. 1 (Notice of Removal).) After reviewing the original complaint, the Court issued an order advising plaintiff that her pleading did not appear to contain allegations which could be construed as setting forth a valid federal claim. (Doc. No. 8.) Plaintiff was afforded leave to file an amended complaint, which she did file on October 14, 2014. (Doc. No. 10 (First Amended Complaint ["FAC"]).)

Defendants subsequently filed motions to dismiss the FAC and/or to enter judgment in their favor on the pleadings. (Doc. Nos. 12, 14.) In a Memorandum Opinion, dated June 22, 2015, the Court dismissed the city, the police department, the hospital, and the healthcare employees. The court also dismissed plaintiff's claims for excessive force, state civil conspiracy, and negligent infliction of emotional distress. (Doc. No. 17 (Memorandum Opinion ["MO"]).)

Following this ruling, the remaining parties proceeded to engage in discovery on the remaining claims of Fourth and Fourteenth Amendment violations under 42 U.S.C. § 1983, federal conspiracy, and state law trespass and intentional infliction of emotional distress. (*Id*. at 167.) The present summary judgment motions were filed after the close of discovery.

## II.  STANDARD OF REVIEW

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id*. at 252.

10

Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co*., 926 F.2d 559, 561 (6th Cir. 1991). The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Banks v. Wolfe Cnty. Bd. of Educ*., 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial). Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 487 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ*., 351 F.3d 240, 247 (6th Cir. 2003) (quotation marks and citation omitted).

A party seeking or opposing summary judgment may rely on deposition transcripts, electronically stored documents, affidavits, declarations, and other materials. Fed. R. Civ. P. 56(c)(1)(A). Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(2); s*ee also Street v. J.C. Bradford & Co*., 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.") (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). Nonetheless, the Court is at liberty to

11

consider any record evidence in resolving a summary judgment motion. Fed. R. Civ. P. 56(c)(2).

Defendants' summary judgment motion relies heavily upon the fact that plaintiff has failed to include specific record cites in her opposition brief. Plaintiff acknowledges this shortcoming, but explains that she was unable to "go line by line" through the deposition testimony. (Def. MSJ Opp'n at 1291.) Given plaintiff's *pro se* status, her unfamiliarity with legal briefing, and the judicial preference to resolve claims on the merits rather than on technicalities, the Court found it appropriate to review all of the record evidence in this case. *See generally Krupski v. Costa Crociere S. p. A*., 560 U.S. 538, 550, 130 S. Ct. 2485, 177 L. Ed. 2d 48 (2010). As discussed below, such a review—and especially a review of plaintiff's deposition—has revealed that there are disputed questions of fact that preclude summary judgment on several claims in the FAC.

### III.  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

#### A.  Certain Officers Seek Dismissal on All Counts

Officers Schmidt, McIlvain, Ralston, Luggelle, and Holzapfel, along with Sargent Heinl, seek summary judgment on all claims in the FAC, given that plaintiff failed to assert any specific allegations against these officers and has pointed to no record evidence that would suggest that they violated her constitutional rights or engaged in any conduct that would, if believed, entitle her to damages against them. The Court agrees that these defendants are entitled to summary judgment in their favor.

It is well settled that a defendant cannot be held individually liable under Section 1983 for constitutional violations absent a showing that the defendant was personally involved in some manner in the alleged unconstitutional conduct. *Miller v. Calhoun Cnty*., 408 F.3d 803, 817, n.3 (6th Cir. 2005) (citation omitted); *see generally Hardin v. Straub*, 954 F.2d 1193, 1197 (6th Cir.

1992). Moreover, a complaint that only refers to defendants in the collective fails to provide individual defendants fair notice of the allegations against them. *See Marcilis v. Twp. of Redford*, 693 F.3d 589, 596 (6th Cir. 2012) (collecting cases); *Mueller v. Gallina*, 311 F. Supp. 2d 606, 608 (E.D. Mich. 2004) ("In order to state a claim under *Bivens*, a plaintiff must allege that the individual defendant was *personally involved* in the alleged deprivation of the plaintiff's constitutional rights." (collecting cases) (emphasis in original).

The FAC makes no distinction between the various defendants. They are collectively referred to as "defendants," with no specific factual allegations directed at any individual defendant. Discovery has shed some light on the actions taken by the various officers. Defendants concede that each of the defendants made at least one visit to plaintiff's residence during the time period set forth in the FAC. (Davis Decl. at 732-33.) Plaintiff also discussed, by name, the activity of certain officers during her deposition. Still, it remains true that there is no evidence that, if believed, would establish that Officers McIlvain, Schmidt, Luggelle, and Holzapfel ever entered plaintiff's residence.[6] (*See* K. Engle Dep. at 846, 914.) In fact, plaintiff fails to even mention these officers, along with Officers Ralston and Luggelle, in her deposition. Further, while she suggests that Sargent Heinl accompanied Garinger to her residence on June 4, 2013, she does not claim that he entered her home with Garinger, or otherwise engaged in any conduct that would constitute a constitutional violation or would rise to the level of intentional infliction of emotional distress. Because the record is devoid of any evidence that would show that defendants Schmidt, McIlvain, Ralston, Luggelle, Holzapfel, and Heinl personally

---

[6] While she does not identify him by name, she indicates that "good old officer 2993" dropped off a notice at her door. (K. Engle Dep. at 914.) Plaintiff does not suggest this officer ever entered her home. Officer 2993 has been identified as Officer Luggelle. (Def. MSJ at 647.)

participated in, or otherwise authorized, approved or knowingly acquiesced in the alleged unlawful conduct, there is no basis for individual liability against them and they are hereby dismissed from this action.

### B.    Fourth Amendment Claim

The Fourth Amendment preserves the right of citizens "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. Generally, to satisfy the Fourth Amendment's reasonableness requirement, a search or seizure must be "accomplished pursuant to a judicial warrant issued upon probable cause." *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 619, 109 S. Ct. 1402, 103 L. Ed. 2d 639 (1989) (citations omitted). One of the well-recognized exceptions to the warrant requirement is consent to search. *See Shameizadeh v. Cunigan*, 338 F.3d 535, 547 (6th Cir. 2003) ("Consent from an individual whose property is to be searched or from a third party who possesses common authority over the premises validates a search that would otherwise be considered unreasonable and unconstitutional.") (citing *United States v. Matlock*, 415 U.S. 164, 171, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974)).

Anyone who has a reasonable expectation of privacy in the place or effects being searched can consent to a warrantless search, and any person with common authority over or other sufficient relationship to the place or effects being searched can give valid consent. *See United States v. McGee*, 564 F.3d 136, 139 (6th Cir. 2009) ("Authority to consent to a search rests on 'mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.'" (quoting *Matlock*, 415 U.S. at 171, n.7);

14

*see, e.g.*, *United States v. Caldwell*, 518 F.3d 426, 429-30 (6th Cir. 2008) (co-occupant of hotel room had authority to consent to search because she had signed into the room as a registered guest of defendant, exited room with defendant immediately before search, and intended to stay there overnight). A consenting co-occupant retains the right to restrict the scope of the search, *see Florida v. Jimeno*, 500 US. 248, 252, 111 S. Ct. 1801, 114 L. Ed. 2d 297 (1991), and even to withdraw his consent once the search has begun. *See United States v. Buckingham*, 433 F.3d 508, 513 (6th Cir. 2006) (citation omitted).

"Even if the person giving consent in fact lacked authority to do so, the consent may nonetheless validate the search if the person reasonably appeared to the police to possess authority to consent to the search." *McGee*, 564 F.3d at 139. Known as "apparent authority," this type of consent occurs "when officers . . . reasonably (though erroneously) believe that the person who has consented to their entry is a resident of the premises[.]" *Illinois v. Rodriguez*, 497 U.S. 177, 186, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990). Law enforcement may rely on a person's "apparent authority" to consent to the search if the reliance is in good faith and is reasonable based on all facts known by the police at the time of the search. *Id*. at 186, 188 (holding that the reasonableness of a police officer's belief that authority actually existed must be judged against an objective standard: whether a person of reasonable caution with the facts available would believe the consenting party had authority over the premises); *see, e.g., United States v. Stokes*, 631 F.3d 802, 808 (6th Cir. 2011) (officer's belief that woman had authority to consent to search of apartment reasonable because she answered the door late at night and officers could only see one bed inside with defendant sleeping on it).

*Rodriguez* represents the seminal case on "apparent authority." While the Supreme Court specifically validated this type of consent, it cautioned that its ruling should not be interpreted as

15

allowing for a third party's naked assertion of authority to automatically establish an objectively reasonable basis for inferring consent. Instead, the Court underscored the fact that "[e]ven when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry." 497 U.S. at 188. Moreover, even when the facts may originally point singularly in the direction of apparent authority, if subsequent discoveries create ambiguity, "any apparent authority evaporates." *United States v. Purcell*, 526 F.3d 953, 964 (6th Cir. 2008) (citing, among authority, *Rodriguez*, 497 U.S. at 188). At that point, the officers must either obtain a warrant, or make further inquiry to reestablish authority before continuing the search. *See Purcell*, 526 F.3d at 963-64 ("[A]pparent authority cannot exist if there is ambiguity as to the asserted authority and the searching officers do not take steps to resolve the ambiguity.") (citing *United States v. Waller*, 426 F.3d 838, 846 (6th Cir. 2005)).

The existence of authority—actual or apparent—to consent does not necessarily end the inquiry. "Even with the consent of a person with common authority, however, the police generally may not enter when another occupant of the home is physically present and expressly refuses to permit entry." *Smith v. City of Wyoming*, 821 F.3d 697, 709 (6th Cir. 2016) (citing *Georgia v. Randolph*, 547 U.S. 103, 106, 126 S. Ct. 1515, 164 L. Ed. 2d 208 (2006)). In *Randolph*, the Supreme Court addressed a situation where police had entered a home, over the defendant's objection, based upon the consent of his wife. In finding the consent invalid, the Court reasoned that "[s]ince the co-tenant wishing to open the door to a third party has no recognized authority in law or social practice to prevail over a present and objecting tenant, his disputed invitation, without more, gives a police officer no better claim to reasonableness in entering than the officer would have in the absence of any consent at all." *Randolph*, 547 U.S. at

16

114. Nevertheless, "a consensual search will stand where a potential objector . . . never refused consent—even if he was available." *United States v. Ayoub*, 498 F.3d 532, 540 (6th Cir. 2007) (citing *Randolph*, 547 U.S. at 121); *see also Fernandez v. California*, --U.S.--, 134 S. Ct. 1126, 1134-36, 188 L. Ed. 2d 25 (2014) (consent to search given by co-occupant of apartment valid, even though defendant had previously objected to search at threshold of apartment, because co-occupant's consent was obtained when defendant was not physically present due to his subsequent lawful arrest).

It is against this legal landscape[7] that the Court considers whether there exists genuine issues of material fact as to whether defendants violated plaintiff's Fourth Amendment rights. With respect to the incidents on April 15 and April 17, 2013, defendants maintain that Kory and Tanya had apparent authority to consent to the officers entering plaintiff's residence. (Def. MSJ at 634, 649-50.) In particular, defendants rely on the following facts: (1) Kory and Tanya listed plaintiff's home as their residence on their licenses; (2) both individuals received mail at the house; and (3) they both had possessions in the home. Defendants further note that Officer Garinger, in particular, was aware that a similar property dispute arose among the parties in August of 2012. (Garinger Decl. ¶ 4.) Plaintiff does not deny that Kory and Tanya identified her home as their residence on their licenses. (K. Engle Dep. at 851, 854.) She further admits that their property was in her house; a fact that is evident from the sign plaintiff made when she returned home from surgery. (*Id*. at 826; *see* Doc. No. 128-2 at 666.)

---

[7] In her opposition brief, plaintiff directs the Court's attention to case law governing vehicle and other investigatory stops, including issues relating to reasonable suspicion. (*See* Def. Mot. MSJ Opp'n at 1296-1298.) This case law is inapposite as the officers were not conducting a *Terry* stop at any time during their interactions with plaintiff.

*April 15 Entry*

Defendants rely heavily upon the Sixth Circuit's decision in *United States v. Penney*, 576 F.3d 297 (6th Cir. 2009). There, defendant's girlfriend, who lived with defendant "off and on[,]" went to the police department to lodge a domestic violence complaint against defendant after defendant had "pushed [her] out" of the residence. *Id*. at 301. The girlfriend did not have a key to the residence, but offered information on the location of drugs in the residence. After defendant's arrest, the police obtained the girlfriend's permission to search the residence. The following day when defendant was released from custody, he advised the police that the girlfriend did not live with him and had no authority to consent to the search. In upholding the search, the court found that officers reasonably relied on the girlfriend's apparent authority to consent to a search of the residence by virtue of the following: (1) the officers knew that the girlfriend had, on occasion, lived with defendant; (2) she had advised the police that she was living with defendant when he kicked her out of the residence earlier that day; (3) her appearance confirmed a recent violent altercation; (4) she kept a car at the residence; and (5) she was familiar with the contents of the residence. *Id.* at 307-08.

The Court agrees that, had plaintiff been absent from the home at the time of the entry, there would be little doubt that the officers could have relied on Kory's apparent authority to consent to a search of the residence, as did the police in *Penney*. The fact that he listed plaintiff's home as his residence on his license and received mail at the residence, coupled with the fact that his personal effects were in the home and he indicated that he had recently resided in the home, would normally leave a reasonable officer to conclude that Kory exercised common authority

18

over the premises.[8] *See, e.g., Harajli v. Huron Twp.*, 365 F.3d 501, 505-06 (6th Cir. 2004) (apparent authority existed where third party listed defendant's house as her residence, she possessed a garage-door opener, and police knew that she had lived in the house in the past); *Rhodes v. McDannel*, 945 F.2d 117, 119 (6th Cir. 1991) (third party had apparent authority where she had previously called the police from the location in question and referred to the residence as her home address); *Johnson v. Wolgemuth*, 257 F. Supp. 2d 1013, 1033-34 (S.D. Ohio 2003) (warrantless search valid where consenting third party met police at the door of the residence, and the third party listed the home as his residence on his hunting license).

The fact remains, however, that plaintiff was present during the entry into her home. Nonetheless, defendants insist that plaintiff did not expressly object to the search and, instead, merely pointed out that Kory did not have a key and his name was not on the mortgage or a lease to the premises. Again, had plaintiff not been present, these facts would not have necessarily called into question his apparent authority. *See, e.g., Penney*, 576 F.3d at 308 (apparent authority was not destroyed by the fact that the consenting girlfriend did not have a key to the residence and was not listed on the lease); *United States v. Clay*, 1 F. Supp. 3d 688, 693 (E.D. Ky. 2014) (holding that the fact that live-in girlfriend did not have a key, her name was not on the lease, and her statements were only corroborated by evidence found after the entry did not vitiate her ability to consent to a search, and noting that there is no case authority requiring a consenting co-habitant to produce a key or a lease) (citing *Waller*, 426 F.3d at 846).

Defendants' argument cannot carry the day on summary judgment because there is a

---

[8] In her opposition to summary judgment, plaintiff now suggests, without any supporting evidence, that Kory lost his license in 2010. This unsworn statement cannot defeat summary judgment. *See, e.g., Alexander v. CareSource*, 576 F.3d 551, 561 (6th Cir. 2009).

disputed question of fact as to whether plaintiff expressly objected to the search. Plaintiff's deposition testimony, if believed, establishes that she did more than simply point out the absence of a key or a lease.[9] Plaintiff testified that, in response to the officers' representation that they were going to follow Kory into the residence, she specifically said "no," a fact she reiterated several times during the course of her deposition. (K. Engle Dep. at 829-30; *see id.* at 838 [when Kory came through the window "because the cops told him to come through that window. Get through that window right now and get us in the back door. *I go no, this is not your home, it's not their home.*"]) (emphasis added). She also attempted to lock the window to prevent Kory from entering her home; another indication that she was objecting to the search. (*Id.* at 830.) Once inside the residence, she continued to protest, advising the officers "they [Kory and Tanya] don't live here and you have no right and they just continued to come in." (*Id.*) These facts, if believed, would support a finding that plaintiff expressly objected to the search and serve to defeat defendants' request for summary judgment.[10] *See United States v. Tatman*, 397 F. App'x 152, 161 (6th Cir. 2010) (defendant expressly objected to search by informing the officer that the consenting third party had no right to let him in and did not live there); *see, e.g., Van Pelt v. Cordes*, No. 4:04-CV-47, 2005 WL 1907240, at *6 (W. D. Mich. Apr. 28, 2005) (defendant's repeated insistence that the consenting third party did not live there and had no right to consent, at a minimum, required the officers to make further inquiry) (citing *Rodriquez*); s*ee also United States v. Ho*, 94 F.3d 932, 934-35 (5th Cir. 1996) (consent withdrawn because defendant

---

[9] Of course, these were not just random facts known to the police. Plaintiff offered these facts as a direct response to the officers' representation that Kory and Tanya lived there, and were part of plaintiff's overall objection to the entry.

[10] Because plaintiff concedes that no officer entered her home at any time during the second and third visit on April 15, 2013, these visits cannot support a Fourth Amendment violation.

attempted to grab portfolio back from officers); *United States v. Fuentes*, 105 F.3d 487, 489 (9th Cir. 1997) (consent withdrawn because suspected shouted "no, wait" when officers reached in to grab object from defendant's pocket).

Defendants argue that, even if a constitutional violation occurred, the responding officers—McGowan and Randall[11]—are entitled to qualified immunity. Qualified immunity shields public officials who perform discretionary functions, such as police officers, from civil liability so long as their conduct does not violate clearly established rights of which a reasonable official would have known. *See Fisher v. Harden*, 398 F.3d 837, 842 (6th Cir. 2005) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). It protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986). Whether qualified immunity applies turns on the "'objective legal reasonableness' of the official's actions, viewed on a fact-specific, case-by-case basis." *Armstrong v. City of Melvindale*, 432 F.3d 695, 699 (6th Cir. 2006) (citation omitted).

To analyze claims of qualified immunity, the Court uses a two-part test: "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310-11 (6th Cir. 2005) (citing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)); *see Bazzi v. City of Dearborn*, 658 F.3d 598, 606-07 (6th Cir. 2011) (citation omitted). "The contours of the right must be sufficiently clear that a

---

[11] Plaintiff suggests that as many as four officers responded to her residence on April 15, 2013, but, even with discovery, was unable to identify any officer other than McGowan. Because defendants concede that Officer Randall accompanied McGowan on the first visit on April 15, 2013, the Court presumes that any question of qualified immunity would be limited to them.

reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987). If the controlling law is not clearly established, an official cannot be liable because "a reasonable person would not be expected to know how to structure his conduct to avoid liability." *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994) (quotation marks and citations omitted).

The Court finds that the same questions of fact that preclude summary judgment in defendants' favor on the underlying Fourth Amendment claim also stand in the way of a summary judgment determination as to the availability of qualified immunity. There can be little doubt that clearly established law provides that, "[e]ven with the consent of a person with common authority . . . the police generally may not enter when another occupant of the home is physically present and expressly refuses to permit entry." *Smith*, 821 F.3d at 709 (citing *Randolph*, 547 U.S. at 106). If the facts are as plaintiff has testified in her deposition, qualified immunity would be unavailable on this claim. Accordingly, the Court must leave to a fact finder the question of whether such an objection was made.

### April 17, 2013 Entry

With respect to the subsequent entry on April 17, 2013, defendants rely on Tanya's apparent authority growing out of the address on her driver's license, the receipt of mail in the house, and the fact that it was previously confirmed that her possessions were in the house. Viewing the evidence in a light most favorable to plaintiff, it appears that plaintiff did object to the presence of officers in her home near the end of the encounter. (K. Engle Dep. at 879 [after

the alleged "strip search" plaintiff said "just everybody get out of my house"].)[12] While not conceding this point, defendants note that the officers were already inside when defendant found Tanya and Officer Garinger at the foot of her staircase. They argue that, once inside, any objection by plaintiff came too late to invalidate the consent. In support, defendants cite *Hays v. Bolton*, 488 F. App'x 971 (6th Cir. 2012). In *Hays*, a homeowner came out of his bedroom to find officers in his home. When he questioned their authority, he was informed that his daughter, whom the homeowner had previously expelled from the home, had let them in. In affirming the district court's grant of qualified immunity to the officers, the Sixth Circuit panel determined that the Supreme Court's decision in *Randolph* "cabin[ed] an objecting co-tenant's power" to where "he voiced his objection as part of the initial discussion of consent to enter the premises." *Id.* at 977 ("*Randolph* limits, clearly and succinctly, an objecting co-tenant's ability to vitiate the previously given consent of his co-tenant to situations where the objecting co-tenant voices his complaint before the search or entry has taken place.") (citing *Randolph*, 547 U.S. at 121).

In so ruling, the court in *Hayes* distinguished another panel decision in *Tatman*. There, defendant's girlfriend led the police across the threshold of the residence where they encountered the defendant. He asked the officers how they gained entry into the house, and he was informed that the girlfriend let them in. The defendant responded to this information with the following: "I told [the officer] that [the girlfriend] had no right to let him in, she had no right to be there, she did not live there." *Id.* at 158. The officer insisted that the defendant never objected, but the district court credited the defendant's account and invalidated the search. On appeal, the Sixth

---

[12] Plaintiff also testified that she "asked about the warrants," but there is no indication in her deposition testimony that she expressly objected to the search. (K. Engle Dep. at 870.) Rather, in her initial interactions with the responding officers, plaintiff was focused on obtaining their assistance in removing Tanya from the house and preventing her from absconding with plaintiff's property. (*Id.* at 868, 870, 878.)

Circuit affirmed the grant of defendant's motion to suppress, finding that defendant was present and standing in the doorway objecting well before the search commenced. *Id.* at 162. The court observed, however, that even if defendant's objection had come too late under *Randolph*, his objection would operate as a withdrawal of the girlfriend's consent, noting that "[i]t stands to reason that because a physically present co-occupant's denial of consent overrides another co-occupants consent, and a consenting party can withdraw his or her consent at any time during the course of a search, [defendant's] objection to [the officer's] presence at the very least operated to withdraw the consent previously given by [the co-occupant]." *Id.* at 163.

While the Court finds the analysis in *Tatman* persuasive, such that the factual dispute over the existence of a belated objection might frustrate summary dismissal of the underlying Fourth Amendment claim, the responding defendants are still entitled to qualified immunity for this entry into the home. The Court cannot find that the reasonable officer would necessarily treat plaintiff's belated objection as the equivalent of a withdrawal of consent by a previously agreeable co-occupant. That said, the Court does not believe that the upshot of *Randolph*[13] is to vitiate the well-established right to withdraw consent, nor can it be understood to permit officers unfettered discretion to extend a consent search indefinitely over a resident's subsequent objection. Still, unlike the first objection on April 15, 2015, which occurred before the officers entered the residence, plaintiff's objection on April 17, 2015 came, if at all, long after the officers had obtained consent to enter the home. *See Hayes*, 488 F. App'x at 978-79. As such, it was reasonable for the responding officers—McGowan and Garinger—to rely on Tanya's prior

---

[13] Though the ruling came out after the searches at issue in this litigation, in *Fernandez*, the Supreme Court essentially confirmed that the ruling in *Randolph* was limited to the situation where the objecting resident "is standing in the door saying 'stay out' when officers propose to make a consent search[.]" *Fernandez*, 134 S. Ct. at 1136.

consent, and they are entitled to qualified immunity for the entry into the home on April 17, 2013.

*April 17, 2013 Search of Plaintiff*

Plaintiff also claims that her Fourth Amendment rights were violated when EMS workers purportedly examined her surgery scar. Defendants dispute that the examination took place, but, in any event, they argue that the Fourth Amendment does not apply to paramedics who respond to a 911 call and provide medical assistance. *See Hearing v. Sliwowski*, 712 F.3d 275, 281-82 (6th Cir. 2013) (granting school nurse qualified immunity for visual examination of student's genital area, and rejecting the position that "it is clearly established under [Sixth Circuit] precedent that the conduct of a school nurse giving medical aid to students is subject to the standard of reasonableness imposed by the Fourth Amendment").

Plaintiff admits that she was examined by EMS workers (and not the police). (Def. MSJ Opp'n at 1305.) Defendants suggest that "[t]he mere presence of an officer during a medical examination or procedure does not convert the procedure into a search entitled to Fourth Amendment protections." (Def. MSJ Reply at 1535 [citing *United States v. Shepherd*, Criminal No. 13-25-ART-EBA-(3), 2014 WL 4594565 (E.D. Ky. Sept. 15, 2014)].) Rather, defendants note that "the police officer must have instigated, encouraged or participated in the search. Second, the individual must have engaged in the search with the intent of assisting the police in their investigative efforts." *United States v. Lambert*, 771 F.2d 83, 89 (6th Cir. 1985) (citations omitted). This much may be true, but, contrary to defendants' representation that plaintiff "makes no allegations against Officer Garinger other than he was present for the medical examination," (*see* Def. MSJ Reply at 1535), plaintiff quite clearly testified that Officer Garinger instructed plaintiff to show her scar to EMS—a fact defense counsel deliberately drew out in

25

plaintiff's deposition. (K. Engle Dep. at 906.) Thus, there is, at least, a factual dispute as to whether Officer Garinger instigated or encouraged the search. Further, plaintiff testified that Officer Garinger instructed her to present her scar to "prove" that she had recently undergone surgery. (*Id.* at 905-06 ["So Garinger called [EMS] and said that's what – they are here to go over you to see if or what to prove that I had surgery."].) Because there are factual disputes as to whether Officer Garinger instigated the EMS search as a means to further the police investigation, defendants are not entitled to summary judgment on this portion of plaintiff's Fourth Amendment claim. These same factual disputes preclude a determination as to the availability of qualified immunity.

Defendants also seek summary judgment on plaintiff's claim that she was forced to undergo a mental health evaluation, a process which she refers to as being "pink slipped." In her deposition, she testified that it was a paramedic who suggested that she go to the hospital for an adult evaluation and handed her a "pink slip" to give to the hospital. (K. Engle Dep. at 878, 880, 881.) She also conceded that she voluntarily agreed to go to the hospital with a friend. (*Id.* at 880; *see also* Garinger Decl. ¶ 10.) Further, she makes no allegation, either in her pleading or in her deposition, that she was held against her will at the hospital. Given these undisputed facts, plaintiff cannot establish that her voluntary trip to the hospital constituted a Fourth Amendment violation.

### *June 4, 2013 Visit*

As to the visit by Officer Garinger on June 4, 2013, defendants argue that they cannot be liable because Garinger remained in a public place—plaintiff's front porch—at all times during the encounter with plaintiff. Once again, factual disputes prevent the Court from dismissing this claim on summary judgment.

26

"Knocking on the front door of a home in order to speak with the occupant—a so-called 'knock and talk'—is generally permissible." *Smith*, 821 F.3d at 712 (citing *United States v. Thomas*, 430 F.3d 274, 277 (6th Cir. 2005)). "Though the threshold of a house is especially protected by the Fourth Amendment, and police may not gather information even from a person's front porch without authorization, the police are authorized to conduct a 'knock and talk' for as long as they have consent." *Id.* (internal and subsequent citations omitted). When the consent evaporates, so does the officer's "authority to continue the interaction." *Id.* (citation omitted). Moreover, "[w]hen an officer coerces a person to answer his questions, or forces his way into a private home, he exceeds the scope of a consensual 'knock and talk' and thus intrudes on Fourth Amendment rights." *Id.*

While defendants insist that Officer Garinger remained on the porch and engaged plaintiff in a consensual discussion, plaintiff described a very different encounter in her deposition. Plaintiff testified that she instructed Officer Garinger to get off her back porch and she would open the door and come out. Instead of complying with this request, she claims that Garinger pushed the door open, forcing plaintiff into the refrigerator and propelling himself into the kitchen. (K. Engle. Dep.at 924; *see id* at 926 [in response to the question of whether Officer Garinger entered the home, plaintiff stated "He came right into – yeah, the door of the back door was open. He stood right inside there so was in the home, yes, standing there."].)[14]

---

[14] Defendants allege that plaintiff is now attempting to contradict her deposition testimony wherein defendants claim she stated that only Nettle entered the house on June 4, 2013. (Def. MSJ Reply at 1532.) The Court does not interpret plaintiff's deposition as drawing this distinction. Viewing plaintiff's deposition testimony in a light most favorable to her, as this Court must on summary judgment, the Court finds that plaintiff explained that while Nettle went through the house, "all this time Garinger's in my kitchen." (K. Engle Dep. at 931.) Likewise, in response to the question "And Garinger was standing there?" plaintiff responded: "We're all standing in the kitchen." (*Id.*) Both statements are entirely consistent with her position in opposition to summary judgment.

Plaintiff also points to a photograph of a foot in her doorway that she alleges belonged to Officer Garinger. If this was the extent of her evidence, this claim would be subject to dismissal, either on the merits or on the basis of qualified immunity. *See Smith*, 821 F.3d at 714 (in granting qualified immunity to a police officer for one of several encounters with the plaintiff, the Sixth Circuit recently observed that they "have found no cases holding that preventing the closure of the door to a home to briefly extend a consensual interview violates the Constitution"). In her deposition, however, plaintiff clearly describes, with substantial detail, an encounter that extended well beyond the doorway and ended with an officer purportedly forcing his way into the home. The Court may not, on summary judgment, resolve this factual dispute in favor of defendants. *See, e.g., id.* at 710 ("Though appellees' position is supported by Sergeant World's deposition testimony, Smith contradicts this with her own testimony. The district court was not entitled to discount Smith's word even if it judged the officer to be more credible.") (citing *Anderson*, 477 U.S. at 255).

### C.     Conspiracy

Plaintiff fails, however, to establish genuine issues of material fact with respect to her federal conspiracy claim. To maintain a claim for civil conspiracy under 42 U.S.C. § 1983, a plaintiff must show an agreement between two or more persons to injure her by unlawful action. *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003) (quotation marks and citation omitted). While an express agreement among all conspirators is not necessary, a plaintiff must show a single plan to violate her rights, that the alleged conspirators shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused the alleged injury. *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011) (citing *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985)) (quotation marks omitted). Defendants posit that they

are entitled to summary judgment on plaintiff's civil conspiracy claim because plaintiff has failed to support this claim with more than conjecture and speculation. The Court agrees.

Plaintiff points to no evidence that would demonstrate a shared plan to violate her constitutional rights or otherwise cause her harm. Instead, in deposition testimony, she merely offered her unsubstantiated belief that Officer Randall obtained the information he put in his police report from Tanya (K. Engle Dep. at 849.) She further muses that she "found out that Tanya had lied and that I do believe that the officers had conspired with Tanya because why would they not – when I said they don't live here, to me they should have stopped and not let them in." (*Id*. at 850-51; *see id* at 852 ["I believe to be the fact that – again, that when I told him to not – that they did not live there, they had no reason to have Kory come in that house so they were conspiring with the police and Tanya and Kory perhaps to do this"].)

In opposition to summary judgment, plaintiff, for the first time, suggests that Tanya had a prior connection with defendant officers because she worked at a local restaurant that was a "known hangout for [A]kron and [C]uyahoga Falls police." (Def. MSJ Opp'n at 1311.) While she points to nothing in the record that would support this conclusion, such an observation is not even properly before the Court because it contradicts her deposition testimony. At her deposition, plaintiff conceded that she did not know if Kory or Tanya knew anybody who worked for the Cuyahoga Falls Police Department. (K. Engle Dep. at 857-58.) It is well settled that "'a party cannot create a genuine issue of material fact by filing an affidavit, after a motion for summary judgment has been made, that essentially contradicts his earlier deposition testimony.'" *Hampton v. Nat'l Am. Red Cross*, 3 F. Supp. 3d 612, 616 (W.D. Ky. 2014) (quoting *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997)). It follows, therefore, that plaintiff cannot generate a fact dispute with a contradictory unsworn statement.

Ultimately, plaintiff has failed to defend against defendants' properly supported motion for summary judgment with any evidence that takes her conspiracy claim beyond the allegations in the FAC. Defendants, therefore, are entitled to summary judgment on this claim. *See Skousen v. Brighton High Sch.*, 305 F.3d 520, 527 (6th Cir. 2002) ("The adverse party cannot rest solely on the allegations made in her pleadings. Rather, she is required to set forth by affidavits or otherwise showing that there is a genuine issue for trial.") Moreover, because defendant Nettle was only implicated in plaintiff's federal conspiracy claim, he is dismissed from this action. (*See* MO at 155 n.5.)

### D.     Due Process

Applying a liberal construction to the FAC, this Court previously found that plaintiff had attempted to raise a substantive due process claim. (MO at 146, 165-66.) In its Memorandum Opinion, dated June 22, 2015, the Court expressed its skepticism that such a claim, which appeared to be premised on the entry by various defendants into plaintiff's home, could be maintained when plaintiff had at her disposal the more specific Fourth Amendment search and seizure claim to remedy this particular constitutional violation. (*Id*. at 166-67.) *See United States v. Lanier*, 520 U.S. 259, 272 n.7, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997) (In limiting the scope of substantive due process, the Supreme Court has held that it should not be relied upon to couch a constitutional claim when a specific constitutional provision protects the right allegedly infringed.) Because the parties had not briefed the issue, the Court elected to leave the matter for summary judgment. (MO at 167.)

Plaintiff now, for the first time, attempts to assert a *procedural* due process claim. In opposition to summary judgment, she insists that she was entitled to a pre-deprivation hearing before her house was condemned. (Def. MSJ Opp'n at 1306-07.) Discovery has now closed, and

plaintiff has not sought leave to amend the FAC to add such a claim. A plaintiff is not entitled to raise a new legal claim for the first time in response to the opposing party's summary judgment motion. *See Tucker v. Union of Needletrades, Indus. & Textile Emp.*, 407 F.3d 784, 788 (6th Cir. 2005) (citing *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)); *Nathan v. Ohio State Univ.*, 984 F. Supp. 2d 789 (S.D. Ohio 2013) ("A plaintiff may not expand his claims to assert new theories for the first time in response to a summary judgment motion.") (citing *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007)); *Lally v. BP Prod. N. Am., Inc.*, 615 F. Supp. 2d 654, 659 (N.D. Ohio 2009) (Plaintiffs "may not expand the scope of their claims in an opposition to a summary judgment motion.") (citation omitted). For this reason alone, defendants are entitled to summary judgment on plaintiff's procedural due process claim.

Even the Court were to consider this claim on the merits, it would still be subject to dismissal. The record establishes that Charles Nettle, the housing inspector, issued an emergency administrative order finding plaintiff's home to be unsafe for habitation, due to unsanitary conditions. (Nettle Decl. ¶¶ 4-7.) According to Nettle, these unsanitary conditions "posed an immediate danger to health and safety." (*Id.* ¶ 6.) Nettle issued plaintiff a letter outlining the violations, setting forth the process for remedying the violations, and explaining her right to appeal his determination. The letter was posted on plaintiff's front and rear doors. (Nettle Decl. ¶ 7.)

Due process requires notice and a hearing prior to an eviction, unless there are extraordinary circumstances where a valid governmental interest is at stake that justifies postponing the hearing until after the eviction. *Fuentes v. Shevin*, 407 U.S. 67, 81-82, 92 S. Ct. 1983, 32 L. Ed. 2d 556 (1972). "Protecting citizens from an immediate risk of serious bodily

harm falls squarely within those 'extraordinary situations' contemplated in *Fuentes*." *Flatford v. City of Monroe*, 17 F.3d 162, 167 (6th Cir. 1994).

The extent of the unsanitary conditions is clearly depicted in numerous photographs defendants have offered in support of their summary judgment motion. (Doc. No. 1128-3.) Plaintiff does not challenge the accuracy of the photographs, but offers only that the mess was not hers, and a conclusory belief that the condition of the residence did not pose a safety threat. Obviously, the origin of the mess is not relevant to the question of whether it posed a safety threat, and plaintiff's conclusory belief, without more, cannot defeat defendants' well supported summary judgment motion. Because the condition of the house constituted an emergency situation, plaintiff was not entitled to a pre-deprivation hearing, and plaintiff has not even suggested that she sought and was denied a post-deprivation hearing or an appeal. As such, she cannot maintain a procedural due process claim.

Nettle would also be entitled to qualified immunity with respect to any such claim. In evaluating a housing official's entitlement to qualified immunity, the relevant inquiry is whether the official's determination that an emergency situation existed was objectively reasonable in light of the information he possessed. *Flatford*, 17 F.3d at 167. Nettle declared that he determined that the condition of the house posed an emergency situation, and the photographs offered support the reasonableness of that determination. (*See* Nettle Decl. ¶ 6; Doc. No. 128-3.) Given that plaintiff does not even dispute the condition depicted in the photographs, Nettle would be entitled to qualified immunity on any asserted procedural due process claim. Additionally, to the extent that plaintiff has attempted to raise a substantive due process claim to address the search and seizures identified in the FAC, the appropriate vehicle is a claim under the Fourth Amendment. *See Boone v. Spurgess*, 385 F.3d 923, 933 (6th Cir. 2004) ("a specific

32

constitutional guarantee—that all seizures be reasonable—trumps a more general guarantee—that all government action conform with substantive due process") (citation omitted).

###### E.       Statutory Immunity and State Claims

Defendants claim an entitlement to immunity with respect to plaintiff's state tort claims for trespass and intentional infliction of emotional distress. Ohio Rev. Code § 2744.03 provides immunity from tort actions for employees of political subdivisions acting in a governmental or proprietary function, and lays out specific exceptions. *Chesher v. Neyer*, 477 F.3d 784, 796 (6th Cir. 2007). Specifically, immunity is not available to an employee who has acted "manifestly outside the scope of [his] employment[,]" acted "with malicious purpose, in bad faith, or in a wanton or reckless manner[,]" or where "liability is expressly imposed upon the employee by a section of the Revised Code." Ohio Rev. Code § 2744.03(A)(6)(a)-(c).

All of the acts that form the basis for plaintiff's state claims were performed in connection with a "government function." *See* Ohio Rev. Code § 2744.01(C)(2)(a). Plaintiff has pointed to no evidence that would establish that defendants were acting outside of the scope of their duties at any time when they allegedly gained entry to her home and, in fact, she alleges that the officers were acting "in their capacity as law enforcement officers[.]" (FAC ¶ 13.) Additionally, plaintiff has failed to identify any section of the Ohio Revised Code that expressly imposes liability for the actions alleged in the FAC, and the Court is not aware of any such provision. Therefore, the city officers will be entitled to immunity on plaintiff's state tort claims unless they acted with malicious purpose, in bad faith, or in a reckless manner.

For purposes of § 2744.03(A)(6), "malice" represents "'the willful and intentional design to do injury, or the intention or desire to harm another, usually seriously, through conduct which is unlawful or unjustified.'" *Woods v. Miamisburg City Sch.*, 254 F. Supp. 2d 868, 881 (S.D.

Ohio 2003) (quoting *Jackson v. Butler City Bd. of City Comm'rs*, 602 N.E.2d 363, 367 (Ohio Ct. App. 1991)); *see Pearl v. City of Wyoming*, No. C-120563, 2013 WL 3328858, at *2 (Ohio Ct. App. June 28, 2013) ("maliciousness" is defined as "'indulging or exercising malice; harboring ill-will or enmity'") (quoting *Teramano v. Teramano*, 216 N.E.2d 375, 377 (Ohio 1966)) (further citation omitted). "Bad faith" implies sinister motive that has "no 'reasonable justification.'" *Hicks v. Leffler*, 695 N.E.2d 777, 780 (Ohio Ct. App. 1997) (quoting *Zoppo v. Homstead Ins. Co.*, 644 N.E.2d 397, 399-400 (Ohio 1994)). It embraces more than bad judgment or negligence. *Id.* (citation omitted). Rather, it suggests "dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud." *Pearl*, 2013 WL 3328858, at *2. "Wanton misconduct" is "the failure to exercise any care whatsoever." *Fabrey v. McDonald Vill. Police Dep't*, 639 N.E.2d 31, 35 (Ohio 1994) (citation omitted); *see Shoup v. Doyle*, 974 F. Supp. 2d 1058, 1089-90 (S.D. Ohio 2013) ("'Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result.'") (quoting *Anderson v. City of Massillon*, 983 N.E.2d 266, 267 (Ohio 2012)). "'Reckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct.'" *Id.* at 1090 (quoting *Anderson*, 983 N.E.2d at 267). As a general rule, "issues regarding malice, bad faith, and wanton or reckless behavior are questions presented to the jury." *Anderson*, 951 N.E.2d at 1069 (quotation marks and citation omitted).

As set forth above, questions of fact remain as to whether defendants acted recklessly with respect to plaintiff's right to be free from unlawful searches and seizures. Knowingly entering a private citizen's home without authorization and facilitating an unreasonable search of

34

the citizen's person would certainly constitute reckless behavior, as would entering a home by force without a warrant or a legal justification for doing so. Until a fact finder can resolve these fact disputes, the availability of statutory immunity for plaintiff's state tort claims cannot be determined.

Even if the Court could rule on the issue of statutory immunity, questions of fact would remain on the underlying state tort claims. In support of their request for summary judgment on plaintiff's state trespass claim, defendants argue that "the officers reasonably believed that they had the consent of Mr. Engle and Ms. Hess to enter the property on April 15 and April 17. Ms. Engle invited the officers onto her property on June 4 . . . [and] Officer Garinger remained in the doorway to discuss Ms. Engle's call." (Def. MSJ at 662.) Because the unresolved issues of material fact go to these very issues, summary judgment on this claim would be inappropriate. Similarly, defendants rely on these same disputed facts in arguing that plaintiff has failed to set forth evidence of extreme and outrageous conduct. (Def. MSJ at 663.) Accordingly, their request for summary judgment on plaintiff's intentional infliction of emotional distress claim must also be denied.

## IV. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff also seeks summary judgment on all claims in the FAC. In essence, her motion consists of a running narrative of the facts as she views them. Although plaintiff is proceeding without the assistance of counsel, her *pro se* status does relieve her of the obligation to set forth admissible evidence showing that there is no genuine issue of material fact and that she is entitled to judgment in her favor as a matter of law. This is the threshold requirement for all parties who seek summary judgement under Rule 56 of the Federal Rules of Civil Procedure. *See Sixty Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). Plaintiff's motion rests on

the same disputed facts upon which defendants attempted to rely in their request for summary judgment. While plaintiff was entitled to have the Court view the facts in a light most favorable for her when it considered defendants' summary judgment motion, she is entitled to no such indulgence when the Court considers her dispositive motion.

If the facts are viewed in the light most favorable to defendants, the evidence shows that Kory and Tanya had apparent authority to consent to the officers' entries into plaintiff's home on April 15 and April 17, 2013. The officers were entitled to rely on this consent and plaintiff did not say or do anything to revoke or call into question this grant of permission. Additionally, neither the examination of plaintiff by EMS, nor the "knock and talk" visit on June 4, 2013, impinged upon plaintiff's constitutional or state statutory rights. If defendants are to be believed, the examination by EMS was neither orchestrated by nor designed to assist the police. In like fashion, defendants' evidence, if believed, would establish that Officer Garinger merely responded to plaintiff's call to police on June 4, 2013, during which he permissibly remained, at all times, on plaintiff's porch as he engaged her in a consensual discussion. Again, Plaintiff's evidence to the contrary merely highlights the fact that there remain significant disputed facts that necessitate a jury trial.

Defendants also complain that plaintiff has impermissibly attempted to use her summary judgment motion to raise new claims that do not appear in the FAC. In particular, defendants accuse plaintiff of raising new claims for false arrest, causing plaintiff to be "pink-slipped" (or forcing her to undergo a mental health evaluation), and unlawful strip search. Applying a liberal interpretation to plaintiff's *pro se* pleading, *see Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972), the Court finds that the issue relating to the physical inspection by EMS, which plaintiff inartfully refers to as a "strip search," was properly pled as a predicate fact

36

supporting her Fourth Amendment claim. (FAC ¶ 14.)  The Court agrees, however, that plaintiff did not properly plead facts that would support a claim that she was falsely arrested, and she may not do so at this late date. *See Bridgeport Music*, 508 F.3d at 400. Additionally, to the extent that the FAC appears to resurrect the previously dismissed excessive force claim, those allegations are hereby struck. (*See* FAC ¶¶ 20, 22; MO at 163.)

## V. CONCLUSION

For all of the foregoing reasons, defendants' motion for summary judgment (Doc. No. 128) is GRANTED IN PART. Specifically, plaintiff's conspiracy claim, her due process claim, and her Fourth Amendment claim—to the extent it seeks redress for the April 17, 2013 entry into her home—are dismissed. Additionally, defendants Schmidt, McIlvain, Ralston, Luggelle, Holzapfel, Heinl, and Nettle are dismissed as party defendants. Plaintiff's summary judgment motion (Doc. No. 134) is DENIED IN FULL. Assuming the remaining parties are unable to reach an amicable resolution of this matter, this case shall proceed to trial on the surviving portions of plaintiff's Fourth Amendment claim, her claim for intentional infliction of emotional distress, and her trespass claim. Where applicable, defendants will be able to request qualified and/or statutory immunity for these claims at trial.

**IT IS SO ORDERED**.


Dated: August 1, 2016                                          _____
                                                                         **HONORABLE SARA LIOI**
                                                                         **UNITED STATES DISTRICT JUDGE**